## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Scott R. Wall, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

## INTRODUCTION

1. The facts of this case, as more fully detailed herein, are that in the early morning hours of October 17, 2021, within the District of Arizona, a gun fight ensued between multiple Unknown Subjects (UNSUBs) at various locations within a short time period on the Pascua Yaqui Indian Reservation, in Tucson, Pima County, AZ. Crime scenes included the Pascua Yaqui tribal cultural grounds where a bullet struck the kitchen roof, a residence at 7518 S Camino Benem which was shot multiple times with a rifle, the roadway in front of 5061 and 5071 W. Calle Tetakusim where multiple spent shell casings were located in two different caliber types, the roadway near S. Yoem Bo-oh and Mako Chini where the Pascua Yaqui Police Chief's unmarked patrol vehicle was shot multiple times, and a crashed Chrysler 300 located near the intersection of W. Calle Tetakusim and S. Ignacio Baumea. I am requesting that the Court issue a search warrant to search three phones (TARGET PHONES 1-3) that are further described in Attachment A. TARGET PHONES 1-3 were located in the Chrysler 300 vehicle, reference search warrant #21-01864MB, in support of an investigation into the aforementioned crime.

## PRELIMINARY BACKGROUND INFORMATION

2. Your affiant, Scott Wall, is a Special Agent of the FBI and is currently assigned to the Tucson office. In the course of his official duties, your affiant is responsible for investigating federal crimes occurring within the District of Arizona, which include violent crimes occurring within Indian Country. Your affiant has training and experience in investigating such crimes.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of the violation of Title 18, United States Code, §§1153, 113 is located in the TARGET PHONES 1-3 described in Attachment A. Accordingly, this application requests authority to search TARGET PHONES 1-3 described in Attachment A, for evidence of this crime as described in Attachment B. The review of the information on Target Phones 1-3 will also be limited to the time periods described in Attachment B.

4. This court has jurisdiction over these offenses under 18 U.S.C. §§1153, 113 because the below-described events occurred within the confines of the District of Arizona, on the Pascua Yaqui Indian Reservation, Indian Country, in Pima County, Arizona.

## STATEMENT OF PROBABLE CAUSE

5. In the early morning hours of October 17, 2021, a tribal cultural celebration was taking place at the Cristo Rey Church and Pascua Yaqui cultural grounds located near the intersection of S. Camino Benem and W. Calle Tetakusim on the Pascua Yaqui Indian Reservation.

6. At approximately 04:45 AM tribal members in the cultural grounds' kitchen heard gunshots. A bullet impacted the kitchen building and ricocheted in the room. Pascua Yaqui dispatch began receiving multiple 911 calls regarding shots fired at various locations in the area.

7. Occupants at the residence of 7518 S. Camino Benem (located across the street from the church and tribal grounds) reported their house was shot multiple times. Subsequent investigation resulted in multiple 7.62x39 caliber rifle casings being located in the alleyway, a short distance from the house. One of the occupants interviewed inside the house stated she heard the shots, heard footsteps running in the alleyway, then heard a vehicle take off at a high rate of speed.

8. Approximately three blocks away from the 7518 S. Camino Benem residence, detectives subsequently located multiple 9mm and .40 caliber shell casings in front of the residence at 5061 W. Calle Tetakusim. Skid marks and gouges in the roadway near the neighbor's house at 5071 W. Calle Tetakusim indicated a vehicle had driven over the curb

and crashed into the light post; however, no damaged vehicle was located in the immediate area. A single tire and broken axle were located in the street.

9.  During this timeframe the Pascua Yaqui Police Chief, M. V. was attending the tribal cultural celebration at the Church. M.V. heard the initial shots, contacted police dispatch, and started canvassing the area in his unmarked Pascua Yaqui Police Department patrol vehicle. As M.V. passed the residence near the area of 5061 W. Calle Tetakusim, he saw individuals run across the street behind him in his rearview mirror. M.V. made a U-turn on W. Calle Tetakusim, turned onto S. Yoem Bo-oh, then turned right onto W. Mako Chini, which is a cul-da-sac, located directly behind the 5071 W. Calle Tetakusim residence. As M.V. turned into the cul-da-sac he began taking fire from an unknown male, shooting a semi-automatic rifle. As M.V. turned around to get out of the cul-da-sac, the unknown male ran after him on foot, continuing to shoot his rifle at M.V. M.V. was not hit. Subsequent investigation showed his unmarked patrol vehicle was shot multiple times through the windshield, in the side door, and in the back window. Multiple .223 caliber spent rifle casings were located in the area.

10. Pascua Yaqui Patrol Officers also responded to the area of W. Calle Tetakusim and S. Ignacio Baumea, which is approximately one-half of a mile from the 5071 W. Calle Tetakusim residence. Officers made contact with T.G., who had been shot in her head. She was subsequently transported to the hospital for a graze wound near her ear and a fractured skull. T.G. survived the encounter.

11.     The vehicle T.G. was driving, a 2019 dark grey Chrysler 300, with Vehicle Identification Number (VIN) 2C3CCABG3KH577774 and Arizona Registration 16A6CSA, was immobilized and sitting off the side of the road. T.G. stated she was driving her son's Chrysler when two boys wearing white were walking by her house, located at 5071 W. Calle Tetakusim. She heard "zinging" but did not know she had been shot. T.G. drove through her neighbors' yard in an attempt to get away. The Chrysler 300 was missing the front right wheel and axle and matched the tire and axle found in front of the 5071 residence. The registered owner of the Chrysler 300 is T.G.'s son, Carlos Moreno (MORENO).

12.     On Monday November 15, 2021, Search Warrant No. 21-06049MB (LCK) was executed on the dark grey Chrysler 300 vehicle, registered to MORENO. An Arizona Driver's License belonging to Esedro Preciado (PRECIADO) was located inside of a bag along with a black Samsung cell phone with black case, bearing IMEI number 352651795588791 (TARGET PHONE 1). Additionally, a Motorola cellphone, bearing model number XT2043-4 and IMEI number 355539118508298, with a multi-colored glitter case and broken screen was located on the rear passenger floorboard (TARGET PHONE 2). A Black iPhone with a red and grey case was also located on the rear passenger seat. (TARGET PHONE 3). TARGET PHONE 3 is currently locked so no further descriptors can be provided. It is difficult to tell who each phone belonged to, but it is believed that there were at least three occupants in the Chrysler 300 on the morning of the incident, based upon follow up investigation.

13. Also located inside the Chrysler 300 was a size small grey hooded sweatshirt. The day of the incident an interview of a witness stated she saw a male running down Yoem Bo-oh wearing a black hoodie with the hood up over his head. She described the male as very skinny and said he almost looked like a little boy. He also carried a rifle. In a separate interview, an additional witness described the same male running down Yoem Bo-oh as wearing a grey hoodie and carrying either a rifle or long shotgun. In another interview, a third witness described the person shooting at M.V., as he drove down Yoem Bo-oh away from the Mako Chini cul-da-sac, as wearing a hoodie. M.V. described the person shooting at him as wearing a light-colored sweatshirt.

14. At this point in the investigation, it is believed that all the incidents described above were related. This includes the Pascua Yaqui tribal cultural grounds where a bullet struck the kitchen roof, the 7518 S Camino Benem residence which was shot multiple times, the shell casings found in front of 5061 and 5071 W. Calle Tetakusim, the roadway near S. Yoem Bo-oh and Mako Chini where the Pascua Yaqui Police Chief's unmarked patrol vehicle was shot multiple times, and the crashed Chrysler 300 located near the intersection of W. Calle Tetakusim and S. Ignacio Baumea.

15. Through follow up interviews it was determined that MORENO and PRECIADO fled the Pascua Yaqui Reservation to Maui, Hawaii after the shootings. Officers with the Maui Police Department confirmed that PRECIADO and MORENO were living in Hawaii and were employed there.

16. A separate search warrant, No. 21-1434 KJM, was sought through the District of Hawaii to collect physical characteristics of MORENO, including DNA and fingerprints. During the execution of that search warrant, Special Agents in Maui, Hawaii attempted to interview MORENO. The interview was very brief, but MORENO did acknowledge he was in the Chrysler 300 vehicle when his mother, T.G., was shot in the head. His description of the events was inconsistent with the evidence collected at the multiple scenes.

17. In a separate interview after the incident with MORENO'S mother, T.G., she described the incident differently than MORENO and her account was more consistent with the evidence located at the scenes. She also that mentioned MORENO had been harassed recently. The harassment started after moving back to the Pascua Yaqui Reservation. She mentioned an incident that involved MORENO's friend Israel Gallardo (GALLARDO). GALLARDO was partying with some people who assaulted GALLARDO. She heard that GALLARDO was standing up for MORENO on the day of that assault and this was the reason for the conflict that initiated the shooting the morning of October 17, 2021.

18. The incident that T.G mentioned was verified through the Pascua Yaqui Police Department, and it occurred on September 4, 2021. That case is still open and was being investigated at the time of this incident, but no arrests have been made. T.G believed that whoever beat up GALLARDO was after MORENO. Because of the gap in time between the September 4, 2021 and October 17, 2021 incidents, there is probable cause to believe

that TARGET PHONES 1-3, located in the Chrysler 300, could have been used to organize resources or communicate with other co-defendants that have not yet been identified.

## TECHNICAL TERMS

19.     Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

20.     Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of

flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

21.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

22.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

23. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training and experience, I know that electronic devices such as the TARGET PHONES 1-3 in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

25. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET PHONES 1-3 were used, where they were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the TARGET PHONES 1-3 and is more fully set forth in the factual section contained herein and because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

b.  Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the TARGET PHONES 1-3 did not have a relationship with the party.

## CONCLUSION

26.   Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the TARGET PHONES 1-3 further described in Attachment A will contain evidence described in Attachment B, which supports an investigation related to violations of 18 U.S.C. §§1153 and 113.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully Submitted

*[signature]*

Special Agent Scott R. Wall
Federal Bureau of Investigation

Subscribed and sworn to me telephonically
this 24th day of June, 2022

*[signature]*

Honorable Lynnette C. Kimmins
United States Magistrate Judge

22-05865MB

# ATTACHMENT A
## DESCRIPTION OF ITEMS TO BE SEARCHED

1: Black Samsung cell phone with black case, IMEI: 352651795588791. (TARGET PHONE 1)

2: Blue Motorola cellphone, model XT2043-4, IMEI: 355539118508298, with multi-colored glitter case and broken screen. (TARGET PHONE 2)

3: Black iPhone with red and grey case. No other identifiers including model number or IMEI are available due to the phone being locked. (TARGET PHONE 3).

## ATTACHMENT B

## ITEMS TO BE SEIZED

**NOTE: All information downloaded will be examined and reviewed using the following dates as a guide for the search, September 4, 2021 – October 17, 2021.**

a. All records including call records, text messages, email, or third-party applications on the TARGET PHONES 1-3 described in Attachment A that relate to violations of Assault Title 18, United States Code §113.

b. Evidence of user attribution showing who used or owned the TARGET PHONES 1-3 at the time the items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, and documents;

c. Photographs and/or videos of drugs and/or weapons and acts of violence with or without a firearm.

d. Any and all notes, documents, records, manifestos, lists, plans, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) related to drugs, drug trafficking, firearms, sale and/ or purchase of firearms, violent crimes involving a firearm, gang and/ or personal retaliations to past instances, jurisdiction, tribal jurisdiction or any other topic pertaining to violations of Title 18, United States Code §113;

e. Any and all correspondence, including but not limited to telephone calls, messages, chat logs, and emails.

f. Any and all search history or queries pertaining to, drugs, drug trafficking, firearms, sale or purchase of firearms, gang and/ or personal retaliations to past instances, jurisdiction, tribal jurisdiction or any other topic pertaining to violations of Title 18, United States Code §113.

g. Any and all notes, documents, records, instructions, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning drugs, firearms, and acts of violence.

h. Any online identifications or handles assigned to Carlos Moreno (MORENO) and Esedro Preciado (PRECIADO) but not limited to identifications for Twitter, Snapchat, Instagram, WhatsApp, Facebook, Facebook messenger, telegram, etc.; and

i. Any contacts, friends lists, address books, or related items;

22-05865MB

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.